No. 13-20144

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

KEITH COFFIN, on behalf of himself and others similarly situated;
ERIC JONES; JOSE L. RANGEL; JOSH FOX; GREGORY ROBINSON;
JASON J. VILLAREAL; DUSTIN AKINS; MASON FULKERSON;
ZACHARY LATIOLAIS,

Plaintiffs – Appellees,

v.

BLESSEY MARINE SERVICES, INCORPORATED,

Defendant – Appellant.

_____

On Appeal from the
United States District Court for the
Southern District of Texas, Houston Division
Civil Action No. 4:11-cv-00214
Hon. Nancy F. Atlas

_____

**BRIEF AMICUS CURIAE OF THE AMERICAN WATERWAYS OPERATORS
IN SUPPORT OF APPELLANT, BLESSEY MARINE SERVICES, INC.,
URGING REVERSAL**

_____

Lynn E. Blais (TX Bar No. 02422520)
Michael F. Sturley (NY Bar No. 1939537)
727 East Dean Keeton Street
Austin, Texas  78705
Telephone:  (512) 232-1334
Facsimile:  (512) 471-6988
**ATTORNEYS FOR AMICUS
THE AMERICAN WATERWAYS
OPERATORS**

No. 13-20144

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

KEITH COFFIN, on behalf of himself and others similarly situated;
ERIC JONES; JOSE L. RANGEL; JOSH FOX; GREGORY ROBINSON;
JASON J. VILLAREAL; DUSTIN AKINS; MASON FULKERSON;
ZACHARY LATIOLAIS,

Plaintiffs – Appellees,

v.

BLESSEY MARINE SERVICES, INCORPORATED,

Defendant – Appellant.

_____

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons
and entities as described in the fourth sentence of Rule 28.2.1 have an interest in
the outcome of this case.  These representations are made in order that the Judges
of this Court may evaluate possible disqualification or recusal.

**A.** **Parties:**

(1)    Blessey Marine Services, Inc. — *Defendant/Appellant*

(2)    Dustin Akins; Keith Coffin, on behalf of himself and others
similarly situated; Joshua Fox; Mason Fulkerson; Eric Jones; Zachary Latiolais; Jose
Rangel; Gregory Robinson; and Jason Villareal — *Plaintiffs/Appellees*

(3)     The District Court dismissed Gregory Anderson, Cody Duke, and Freddie McLemore as Plaintiffs.

(4)     The American Waterways Operators and the American Maritime Association appear as amici curiae in support of the Defendant/Appellant, Blessey Marine Services, Inc., urging reversal.

**B.**     **Attorneys:**

The attorneys for the Defendant/Appellant Blessey Marine are:

(1)     Steven F. Griffith, Jr.
        Matthew C. Juneau
        Baker Donelson Bearman Caldwell & Berkowitz, PC
        New Orleans, Louisiana

(2)     Thomas J. "Beau" Bethune, IV
        Blessey Marine Services, Inc. (in house)
        Harahan, Louisiana

The attorneys for the Plaintiffs/Appellees are:

(1)     Mark J. Oberti
        Edwin Sullivan
        Oberti Sullivan, LLP
        Houston, Texas

The attorneys for amicus the American Waterways Operators are:

(1)     Lynn E. Blais
        Michael F. Sturley
        Austin, Texas

The attorney for amicus the American Maritime Association is:

(1)     James C. Winton
        Baker & Hostetler LLP
        Houston, Texas

### C.    Other Persons and Entities

The issues presented by this appeal affect the inland tank barge and towboat industry, including the persons and entities engaged in parallel litigation in this Circuit regarding the classification of tankermen as seamen under the Fair Labor Standards Act.[1]

/s/ Lynn E. Blais
Lynn E. Blais

**Counsel for Amicus**
**The American Waterways Operators**

---

[1] In this Circuit, Amicus is aware of the following pending cases:  *Barnett v. Higman Marine Inc.*, No. 3:12-cv-00036, S.D. Tex. (Costa, J.); *Brooks v. LeBoeuf Bros. Towing LLC*, No. 2:12-cv-2002, E.D. La. (Morgan, J.); *Bryant v. Enterprise Products Partners, LP*, No. 3:11-cv-00296, S.D. Tex. (Costa, J.); *Bryant v. American Commercial Lines, LLC*, No. 3:11-cv-00297, S.D. Tex. (Costa, J.); *Figgs v. Kirby Corp.*, No. 3:11-cv-00306, S.D. Tex. (Costa, J.); *Johnson v. Canal Barge*, No. 3:12-cv-00037, S.D. Tex. (Costa, J.); *Ratley v. Harley Marine Services, Inc.*, 3:12-cv-00247, S.D. Tex. (Costa, J.); *Simon v. Talen's Marine & Fuel, LLC*, No. 2:13-cv-00286, E.D. La. (Morgan, J.). *Thompson v. Stone Oil*, No. 2:12-cv-00767, E.D. La. (Morgan, J.); *Webb v. Settoon Towing, LLC*, 2:12-cv-02861, E.D. La. (Morgan, J.).  Outside of this Circuit, Blessey Marine is aware of the following pending cases:  *Connet et al. v. Chatham Towing Co. et al.*, No. CV413-048, S.D. Ga. (Edenfield, J.).

iv

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................ i

TABLE OF AUTHORITIES ..................................................... v

INTEREST OF AMICUS CURIAE ............................................... 1

SOURCE OF AUTHORITY TO FILE ............................................ 4

ARGUMENT .............................................................. 4

I. Vessel-based Tankermen are Exempt Seamen Under the FLSA ............... 7

    A. Seaman's Work Has the Same Meaning Under the Jones Act, the LHWCA, and the FLSA, While Coverage Is Determined by How Much Seaman's Work a Particular Employee Does ...................... 7

    B. A Fundamental Requisite of Seaman's Work is That it Be Performed by a Member of the Crew ..................................... 9

    C. Loading and Unloading a Vessel is Seaman's Work When Done by a Member of the Crew ............................................. 11

    D. *Owens* is Inapposite Because Owens Was Not a Member of the Crew and Therefore None of His Work Could Have Been Seaman's Work .......................................................... 16

II. Treating Vessel-based Tankermen as Non-exempt Seamen Would Not Serve the Underlying Goals of the FLSA's Overtime Provision, Would Undermine Settled Expectations, and Would Disrupt Commerce in Inland and Coastal Waterways ............................. 21

CONCLUSION ............................................................ 28

CERTIFICATE OF COMPLIANCE ............................................. 29

v

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Manhattan Lighterage Corp.*,
  148 F.2d 971 (2d Cir. 1945) ............................................. 19

*Chandris Inc. v. Latsis*, 515 U.S. 347 (1995) ........................... *passim*

*Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012) ......... 23-24

*Dole v. Petroleum Treaters, Inc.*, 876 F.2d 518 (5th Cir. 1989) ......... 9-10, 20

*Gale v. Union Bag & Paper Corp.*, 116 F.2d 27 (5th Cir. 1940) ........... 12

*Gilbert v. United States*, 370 U.S. 650 (1962) ......................... 8

*Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548 (1997) .................. 17

*Harkins v. Riverboat Services, Inc.*, 385 F.3d 1099 (7th Cir. 2004) ..... 8, 13, 21

*International Stevedoring Co. v. Haverty*, 272 U.S. 50 (1926) ........... 15

*Jamison v. Encarnacion*, 281 U.S. 635 (1930) .......................... 15

*Louviere v. Standard Dredging Corp.*, 239 F.2d 164 (5th Cir. 1956) ..... 5, 12, 20

*Lozman v. City of Riviera Beach*, 133 S. Ct. 735 (2013) ................ 12

*Martin v. Bedell*, 955 F.2d 1029 (5th Cir. 1992) ...................... 8, 12-13, 26

*McCarthy v. Wright & Cobb Lighterage Co.*,
  163 F.2d 92 (2d Cir. 1947) ........................................... 19

*McDermott International, Inc. v. Wilander*, 498 U.S. 337 (1991) ........ 7-12

*McMahan v. Adept Process Services, Inc.*, 786 F. Supp.2d 1128 (E.D. Va.
  2011) ................................................................ 5

*Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173 (7th Cir. 1987) ... 22-23

*Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539 (1960) .................. 15

*Morissette v. United States*, 342 U.S. 246 (1952) ..................... 8

*Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249 (1977) ............... 26

*Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959) ............................. 11

*Owens v. SeaRiver Maritime, Inc.*, 272 F.3d 698 (5th Cir. 2001) .............. *passim*

*P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69 (1979) ...................................... 26

*Pacific Merchant Shipping Association v. Aubry*, 918 F.2d 1409 (9th Cir. 1990) .................................................................................................. 8, 21

*Seas Shipping Co. v. Sieracki*, 328 U.S. 85 (1946) ........................... 14-16, 19

*Selby v. Yacht Starship, Inc.*, 624 F. Supp.2d 1367 (M.D. Fla. 2008) ........... 13, 27

*Stewart v. Dutra Construction Co.*, 543 U.S. 481 (2005) ...................... 10

*Swanson v. Marra Brothers, Inc.*, 328 U.S. 1 (1946) .......................... 16

*Tate v. Showboat Marina Casino Partnership*, 431 F.3d 580 (7th Cir. 2005) ....................................................................................................... 21

*Tate v. Showboat Marina Casino Partnership*, 357 F. Supp.2d 1075 (N.D. Ill. 2005), *aff'd*, 431 F.3d 580 (7th Cir. 2005) .......................... 13

*Tobin v. Woods Lumber Co.*, 20 Lab. Cas. (CCH) ¶ 66,640 (W.D. Tenn. 1951), *aff'd*, 199 F.2d 455 (6th Cir. 1952) (per curiam) ...................... 19

*Uravic v. F. Jarka Co.*, 282 U.S. 234 (1931) ...................................... 15

*Walling v. Bay State Dredging & Contracting Co.*, 149 F.2d 346 (1st Cir. 1945) ........................................................................................................ 21

*Walling v. W.D. Haden Co.*, 153 F.2d 196 (5th Cir. 1946) ................... 20

*Weaver v. Pittsburgh Steamship Co.*, 153 F.2d 597 (6th Cir. 1946) ......... 13-14

## STATUTES, RULES, AND REGULATIONS

1 U.S.C. § 3 ................................................................................................. 12

Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-19 ...................... *passim*

29 U.S.C. § 213(a)(1) ............................................................ 23

29 U.S.C. § 213(b)(6) ............................................................ 4

Longshore and Harbor Workers' Compensation Act (LHWCA),
33 U.S.C. §§ 901-50 .................................................. 7, 10, 26

LHWCA § 2(3)(G), 33 U.S.C. § 902(3)(G) ............................ 7

LHWCA Amendments of 1972, 86 Stat. 1251 (amending LHWCA) ....... 16

Jones Act, 46 U.S.C. § 30104 ....................................... *passim*

FRAP 29(c)(5) ...................................................................... 1

29 C.F.R. § 783.31 ........................................... 4, 11-12, 16-17

29 C.F.R. § 783.32 ............................................................. 19

29 C.F.R. § 783.36 ............................................................. 19

29 C.F.R. § 783.37 ........................................................... 4, 9

46 C.F.R. § 13.101 ............................................................... 3


**<u>OTHER</u>**

H.R. Rep. No. 1452, 75th Cong., 1st Sess. (1937) .................... 22

S. Rep. No. 884, 75th Cong., 1st Sess. (1937) ....................... 22

Plaintiffs' Response to Defendant's Motion for Summary Judgment ........... 11

<u>www.americanwaterways.com</u> (visited July 4, 2013) .................. 4

# INTEREST OF AMICUS CURIAE[2]

The American Waterways Operators (AWO) is the national trade association for the United States' inland and coastal tugboat, towboat, and barge industry, serving 350 member companies. That industry is critically important to the U.S. economy. With over 4,000 tugboats and towboats and more than 27,000 barges throughout the country, the industry employs more than 30,000 U.S. mariners. From the tugboats assisting large container ships into port to the barges that traverse the inland and coastal waterways, the industry helps to move the nation's commerce safely and efficiently.

Inland and coastal barge transportation is the most efficient and economical form of domestic cargo transportation in the United States. Each year, tugboats, towboats, and barges move more than 800 million tons of raw materials and finished goods along the nation's inland and coastal waterways.

The AWO and its members have a substantial interest in ensuring that the nation's interstate waterways continue to serve their vital role in interstate commerce, and that the tugboat, towboat, and barge industry continues to ensure the safe and efficient transportation of interstate commerce. To that end, AWO members have a long history of safety leadership and cooperation with the U.S. government to improve the safety of the tugboat, towboat, and barge industry. In

---

[2] Pursuant to FRAP 29(c)(5), counsel for amicus curiae AWO state that no counsel for any party authored this brief in whole or in part, and that no person or entity other than AWO made a monetary contribution intended to fund the preparation or submission of this brief.

1994, the AWO became the first transportation trade association to adopt a code of safe practice and environmental stewardship. The Responsible Carrier Program (RCP) is a third-party-audited safety-management system that implements safety and environmental protection practices exceeding government standards. Since 2000, all the AWO members must comply with the RCP. AWO is also part of the oldest public-private partnership between the U.S. Coast Guard and its stakeholders. Since 1995, the partnership has launched more than 40 cooperative initiatives to improve safety and environmental protection. Another indispensable component of a safe and efficient transportation industry is the ability to hire and retain trained and competent seamen to operate their vessels. To do so, the industry must have clear and sensible guidelines for paying their workers fair wages.

As part of their multi-faceted U.S. fleets, some AWO members operate tank barges and towing vessels to transport liquid cargo. The AWO represents the operators of almost all of the approximately 3,300 inland tank barges, which are moved by towing vessels. Loading and unloading these tank barges is accomplished by tankermen, including about 2,000 vessel-based tankermen who live and work aboard the towing vessels, and 550 land-based tankermen. Those tank barges move liquid-bulk commodities, including chemicals, heating fuel, crude oil, gasoline, jet fuel, and agricultural chemicals – products vital to consumers in their

everyday lives.  For example, virtually all of New England's home heating oil and gasoline are transported on the nation's waterways by barges and towing vessels.

When an inland towboat and tank barge are in navigation, the crew usually consists of a captain, a pilot, one or more tankermen, and one or more deckhands. The captain commands the vessel and the crew.  The pilot, the captain's second-in-command, alternates shifts with the captain in navigating the vessel.  A deckhand is a general maritime worker assigned a range of basic duties such as cleaning, cooking, standing watch, handling lines, and repairing lines.  Tankermen also perform all manner of work on the towboats, including all the deckhands' work.  In addition, tankermen have earned a special Coast Guard endorsement permitting additional duties: in particular, preparing the barge for loading and discharging liquid cargo and loading and discharging liquid cargo.  46 C.F.R. § 13.101, *et seq*. During a maritime career, a worker might start as a deckhand and, with experience and additional training, be promoted to tankerman, then to pilot, and finally to captain.

The decision below, carving out some crewmen from the rest of the crew and requiring employers to adopt an entirely distinct and unworkable pay structure for them, ignores tankermen's inherent role in the vessel crew and undermines the industry's ability to serve its vital role in the nation's commerce.  If upheld, that

interpretation would have significant negative impacts on the entire industry and adversely affect a crucial component of the nation's interstate commerce.

The AWO's website, www.americanwaterways.com, provides additional information about the AWO and the industry.

## SOURCE OF AUTHORITY TO FILE

All parties have consented to the filing of this brief.

## ARGUMENT

Workers are exempt from the overtime provisions of the Fair Labor Standards Act (FLSA) if they are "employed as a seaman." 29 U.S.C. § 213(b)(6). Pursuant to the Department of Labor's (DOL) interpretation of that statute, a maritime worker is "employed as a seaman" if "he performs, as a master or subject to authority, direction, and control of the master aboard a vessel, service which is rendered primarily as an aid in the operation of such vessel as a means of transportation, provided he performs no substantial amount of work of a different character." 29 C.F.R. § 783.31. The DOL considers such differing work to be "'substantial' if it occupies more than 20 percent of the time worked by the employee during the workweek." 29 C.F.R. § 783.37.

As noted above (at 3), when a tank barge is transporting liquid cargo, its crew generally consists of the captain, pilot, tankermen, and deckhands. It is undisputed that captains, pilots, and deckhands are FLSA-exempt seamen. *See*, *e.g.*,

*McMahan v. Adept Process Services, Inc.*, 786 F. Supp.2d 1128, 1136-39 (E.D. Va. 2011) (captains and deckhands).   The structure, purpose, and history of the FLSA make clear that vessel-based tankermen are also exempt seamen.

Like all members of a towboat crew, tankermen typically work in hitches – meaning that they work a set number of days, followed by a set number of days off.   In a typical "2-for-1" hitch, a crew member works 20 or 28 days on the vessel followed by 10 or 14 days off.   During on-duty days, they work two six-hour shifts per day and live on the towboat as it transports cargo.   Tankermen are subject to the command of the captain at all times on the towboat.   During their shifts, tankermen perform all the work of a deckhand – including cleaning, cooking, painting, chipping, and handling lines – which is undisputedly seaman's work.   *See Louviere v. Standard Dredging Corp.*, 239 F.2d 164, 165 (5th Cir. 1956).   In addition, tankermen are responsible for loading and unloading liquid cargo.

The nature of vessel-based tankermen's work ensures that the percentage of time spent on additional duties will differ week-to-week and shift-to-shift, and will be nearly impossible to ascertain precisely, even after the fact.   A vessel-based tankerman's hitch corresponds to the calendar, not the vessel's movement.   A hitch begins on a specified day, regardless of the vessel's location.   If the vessel is then

in port, the tankerman will board the tugboat there. If the vessel is en route, he[3] will take a skiff from the nearest port. Weather, traffic, and mechanical issues all influence a voyage's length; some voyages may take longer than a tankerman's hitch. In that case, he will do no loading or unloading during the hitch. For other hitches on the same vessel traveling the same route, he may load and unload several times. For some tankermen on some hitches, the proportion of loading and unloading work is less than 10%. In an extreme case, it could be over 50%.

The district court erred when it held, as a matter of law, that a vessel-based tankerman's additional duties – loading and unloading liquid cargo – are not seaman's work. To the contrary, seaman's work encompasses all of the myriad duties undertaken by members of the crew that contribute to the mission of the vessel. That work can vary from cooking, cleaning, and watch-keeping to piloting the vessel. Under the district court's interpretation, every member of a towboat crew is a seaman except tankermen, who are sometimes seamen and sometimes not, a status that changes weekly depending on completely unpredictable matters outside the control of the employer, captain, and tankermen.

---

[3] The AWO recognizes that many women are employed in the tugboat, towboat, and barge industry. For the sake of brevity, however, men and women are collectively referred to as "he" in this brief.

## I.    Vessel-based Tankermen are Exempt Seamen Under the FLSA

### A.    Seaman's Work Has the Same Meaning Under the Jones Act, the LHWCA, and the FLSA, While Coverage Is Determined by How Much Seaman's Work a Particular Employee Does

Although the scope of coverage under several important federal statutes is premised on whether a maritime worker is a seaman, none provide concrete guidance as to the term's meaning.  When Congress enacted the Jones Act in 1920 to provide a cause of action in negligence for "any seaman" injured "in the course of his employment," 41 Stat. 1007, *codified as amended at* 46 U.S.C. § 30104, it did not define "seaman."  Similarly, when Congress exempted seamen from the FLSA minimum-wage and overtime provisions,[4] it offered no definition of the term.  The Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950, providing workers' compensation to maritime employees other than seamen, offered some insight into the meaning of the term by excluding "a master or member of a crew of any vessel" from coverage.  *Id*. § 902(3)(G).  The Supreme Court has held that "master or member of a crew" represents "a refinement of the term 'seaman' in the Jones Act."  *McDermott International, Inc. v. Wilander*, 498 U.S. 337, 347 (1991).

When Congress employs a term of art as a key statutory term without defining it, courts presume Congress intended the established meaning.  *See id*. at 342

---

[4]  In 1961, the minimum-wage provision was extended to seamen.  The overtime provision relevant here still exempts seamen.

8

("'[S]eaman' is a maritime term of art. In the absence of contrary indication, we assume that when a statute uses such a term, Congress intended it to have its established meaning.") (citing *Morissette v. United States*, 342 U.S. 246, 263 (1952); *Gilbert v. United States*, 370 U.S. 650, 658 (1962)). Under established principles of maritime law, any person employed on a vessel in furtherance of its mission is a seaman. *Id*. at 346. There is no reason to assume that this general presumption does not apply equally in the FLSA context, particularly because seamen's unions were the principal proponents of retaining the seaman's exemption from the FLSA overtime provision to maintain consistent coverage standards among the various statutes. *See Pacific Merchant Shipping Association v. Aubry*, 918 F.2d 1409, 1418 n.12 (9th Cir. 1990).

Not all Jones Act seamen are exempt from the FLSA overtime provisions. *Martin v. Bedell*, 955 F.2d 1029, 1035 n.11 (5th Cir. 1992).[5] Although courts have held that Jones Act coverage and the FLSA seaman exemption both turn on the amount of seaman's work done, the formula is different for the two statutes. The coverage provision of the Jones Act is broadly construed to effectuate the statute's remedial goal of protecting vessel-based mariners from the perils of the sea, while the FLSA seaman's exemption is read narrowly to further that Act's remedial

---

[5] *But cf. Harkins v. Riverboat Services, Inc.*, 385 F.3d 1099, 1103 (7th Cir. 2004) (suggesting that "when persons employed on a ship . . . are classified as seamen for purposes of entitlement to the special employment benefits to which seamen . . . are entitled, a presumption arises that they are seamen under the FLSA as well").

goals. *E.g.*, *Dole v. Petroleum Treaters, Inc.*, 876 F.2d 518, 522-23 (5th Cir. 1989). Thus – under the rule of thumb developed by this Court and adopted by the Supreme Court in *Chandris Inc. v. Latsis*, 515 U.S. 347, 371 (1995) – workers spending as little as 30% of working time as seamen still qualify for Jones Act protection. But under DOL's FLSA interpretation, workers are exempt from the FLSA overtime rules only if they spend at least 80% of their working time as seamen. *See* 29 C.F.R. § 783.37.

Thus, the broader application of the Jones Act and the narrower application of the FLSA exemption is determined by the proportion of an employee's seaman's work. But Congress´s understanding of what constitutes seaman's work is subject to the same established meaning in each statute.

### B.   A Fundamental Requisite of Seaman's Work is That it Be Performed by a Member of the Crew

It is a "basic principle[]" of statutory and general maritime law that "seamen do not include land-based workers." *Chandris*, 515 U.S. at 358 (quoting *Wilander*, 498 U.S. at 348). As the Supreme Court has observed, "Congress established a clear distinction between land-based and sea-based maritime workers. The latter, who owe their allegiance to a vessel and not solely to a land-based employer, are seamen." *Wilander*, 498 U.S. at 347. Conversely, "[a] maritime worker who spends only a small fraction of his working time on board a vessel is fundamen-

tally land based and therefore not a member of the vessel's crew, regardless of what his duties are." *Chandris*, 515 U.S. at 371.

The distinction is fundamental. The *Wilander* Court held that "the better rule is to define . . . 'seaman' . . . solely in terms of the employee's connection to a vessel in navigation. This rule best explains our case law and is consistent with the [general maritime law] interpretation of 'seaman' and Congress' land-based/sea-based distinction." 498 U.S. at 354. Ultimately, to be a seaman, a worker "must have [an employment-related] connection to a vessel in navigation . . . that is substantial in terms of both its duration and its nature." *Chandris*, 515 U.S. at 368; *see also Stewart v. Dutra Construction Co.*, 543 U.S. 481, 488 (2005) ("[T]he Jones Act and the LHWCA are complementary regimes that work in tandem: The Jones Act provides tort remedies to *sea*-based maritime workers, while the LHWCA provides workers' compensation to *land*-based maritime employees.").

The FLSA seaman exemption incorporates the same distinction between vessel-based and land-based workers. The DOL's interpretive bulletins detailing the scope of the seaman exemption, which this Court has held "are entitled to great weight," *Dole*, 876 F.2d at 521, clearly distinguish between members of the crew and non-crewmembers:

> [A]n employee will ordinarily be regarded as "employed as a seaman" if he performs, as master or subject to the authority, direction, and control of the master aboard a vessel, service which is rendered primarily as an aid in the operation of such vessel as a

> means of transportation, provided he performs no substantial
> amount of work of a different character.

29 C.F.R. § 783.31. Thus, as in the Jones Act and the LWHCA, the FLSA sea-

man's exemption begins with the premise that a "seaman" must be either a master

or "subject to the authority, direction, and control of the master aboard a vessel."

In other words, in each statutory scheme, a worker must, at a minimum, be a ves-

sel-based employee (*i.e.*, a master or member of the crew) to qualify as a seaman.

It is undisputed that appellees, as tankermen who lived and worked on their

vessels for weeks at a time and were subject to the direction of the master, are

members of the vessel's crew. *See* Plaintiffs' Response to Defendant's Motion for

Summary Judgment, at 15 ("[T]he Tankerman [in *Owens*] was land-based, not

vessel-based like the ones in this case.").

## C. Loading and Unloading a Vessel is Seaman's Work When Done by a Member of the Crew

The second step of the seaman inquiry is also substantially the same for each

statute. A Jones Act seaman is a vessel-based worker whose duties "'contribut[e]

to the function of the vessel or to the accomplishment of its mission.'" *Wilander*,

498 U.S. at 355 (quoting *Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir.

1959)) (alteration by *Chandris* Court). Similarly, under the DOL's interpretation

of the FLSA overtime exemption, a seaman is a vessel-based worker who "per-

forms . . . service which is rendered primarily as an aid in the operation of [the]

vessel as a means of transportation." 29 C.F.R. § 783.31. These interpretations are essentially synonymous. The mission of a vessel is transportation. *See* 1 U.S.C. § 3 (A vessel is a watercraft "used, or capable of being used, as a means of transportation on water."); *cf. Lozman v. City of Riviera Beach*, 133 S. Ct. 735, 739 (2013). Thus, aiding the operation of a vessel as a means of transportation is the same as contributing to its mission.

For vessel-based workers, this Court had long held that a wide range of tasks contribute to the mission of the vessel. *Cf. Wilander*, 498 U.S. 337, 355 ("It is not necessary that a seaman aid in the navigation or contribute to the transportation of the vessel, but a seaman must be doing the ship's work."). In *Gale v. Union Bag & Paper Corp.*, 116 F.2d 27, 27 (5th Cir. 1940), for example, this Court held that vessel-based barge tenders are exempt seaman because they "perform the services usual to their occupation." With very little discussion of the actual range of the barge tenders' duties, it confidently concluded that those duties "were necessary for the operation, welfare and safety of the barges" and are therefore "services of a maritime character." *Id*. at 28. Similarly, this Court readily dismissed the claim that a vessel-based deckhand on a tugboat "performing the duties routinely and customarily prescribed for such employment" might not be an exempt seaman. *Louviere*, 239 F.2d at 165. In *Martin*, this Court made clear that vessel-based

cooks are engaged in work that contributes to the mission of the vessel when they cook for seamen.  955 F.2d at 1936.

Other federal courts agree.  In *Harkins v. Riverboat Services, Inc.*, 385 F.3d 1099, 1100 (7th Cir. 2004), for example, the Seventh Circuit readily concluded that a riverboat casino's crew were FLSA seamen, although the riverboat rarely left port and "[m]ost of the [crew] . . . spent much of their time doing the kind of housekeeping chores that they would have done in a casino that was on land."  As the court observed:

> A ship is a means of transportation, and . . . the marine crew is responsible for its safe and efficient operation and maintenance – for keeping it afloat and clean, scraping the barnacles off its hull, keeping the engines in repair, preventing fires, etc.  All this is maritime work, and the members of the ship's crew who do it . . . are seamen . . . .

*Id*. at 1104; *see also Selby v. Yacht Starship, Inc.*, 624 F. Supp.2d 1367, 1378 (M.D. Fla. 2008) ( "the plaintiff's general cleaning duties were necessary to the safe and efficient operation of the vessel and therefore qualify as seaman's duties"); *Tate v. Showboat Marina Casino Partnership*, 357 F. Supp.2d 1075, 1084 (N.D. Ill. 2005) ("the cleaning and replacement of ceiling tiles are services performed to maintain the safety of the *Winstar* as a ship, and are maritime duties performed by seamen"), *aff'd*, 431 F.3d 580 (7th Cir. 2005); *Weaver v. Pittsburgh Steamship Co.*, 153 F.2d 597, 599, 602 (6th Cir. 1946) (plaintiff "employed as a seaman" who generally "worked, ate and slept aboard ship" and whose boiler-

room duties included "starting fires in the boilers, . . . repairing grates, pipes and gaskets, scraping rust, painting, cleaning" was exempt from FLSA coverage as a seaman).

Loading and unloading a vessel, when performed by a member of the crew, is as much an aid in the operation of a vessel as a means of transportation as cleaning, scraping, painting, replacing tiles, and cooking for crew. Each is performed by members of the crew to contribute to the vessel's mission. Indeed, loading and unloading vessels has long been recognized as a classic example of a seaman's work – and the Congress that enacted the FLSA would undoubtedly have considered loading and unloading vessels to be seaman's work.

In 1946, just a few years after Congress enacted the FLSA, the Supreme Court extended "the obligation of seaworthiness, traditionally owed by an owner of a ship to seamen," to a longshoreman injured while loading a ship. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 87 (1946). The Court's rationale is instructive:

> Historically the work of loading and unloading is the work of the ship's service, performed until recent times by members of the crew. . . . That the owner seeks to have it done with the advantages of more modern divisions of labor does not minimize the worker's hazard and should not nullify his protection.

328 U.S. at 96. The Court concisely summarized its reasoning in a single sentence:

> For these purposes [the longshoreman] is, in short, a seaman because he is doing a seaman's work and incurring a seaman's hazards.

328 U.S. at 99.[6]  Thus the Court's central premise (on which the decision rested) was that loading a vessel was "seaman's work."

Although *Sieracki*'s extension of the obligation of seaworthiness to a long-shoreman was novel, the recognition that seaman's work included loading and unloading vessels was already well-established a dozen years before Congress enacted the FLSA.  In *International Stevedoring Co. v. Haverty*, 272 U.S. 50 (1926), the Supreme Court extended the benefit of the Jones Act – a statute explicitly limited to seamen – to a longshoreman injured while loading a vessel.  Writing for the unanimous Court, Justice Holmes recognized that longshoremen are not commonly "seamen," but because "[t]he work upon which the plaintiff was engaged was a maritime service formerly rendered by the ship's crew," he concluded that Congress intended to extend the same "protection to men engaged upon the same maritime duties."  *Id.* at 52; *see also*, *e.g.*, *Uravic v. F. Jarka Co.*, 282 U.S. 234 (1931) (applying *Haverty* to a longshoreman fatally injured while unloading a vessel); *Jamison v. Encarnacion*, 281 U.S. 635 (1930) (applying *Haverty* to a long-shoreman injured while loading a barge).

It is true that the precise holdings of *Sieracki* and *Haverty* have been superseded by subsequent developments.  In 1972, longshoremen lost the benefit of the

---

[6]  In *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539 (1960), a year before Congress decided to maintain the FLSA seaman's overtime exemption, Justice Frankfurter similarly described the issue in *Sieracki* as "whether the warranty of seaworthiness . . . covered longshoremen doing seaman's work."  *Id.* at 567 (Frankfurter, J., dissenting).

warranty of seaworthiness, *see* LHWCA Amendments of 1972, 86 Stat. 1251, and in 1946 they lost the benefit of the Jones Act, *see Swanson v. Marra Brothers, Inc.*, 328 U.S. 1 (1946).   But those developments were based on Congress's policy choice to give land-based employees a workers' compensation scheme, not on any rejection of the Supreme Court's recognition that loading and unloading vessels is "seaman's work."   *Sieracki*, 328 U.S. at 99.   In any event, the Congress that enacted the FLSA and created the seaman exemption would clearly have recognized that loading and unloading vessels is "seaman's work."   And none of these subsequent developments affect that recognition with respect to vessel-based workers who are members of the crew.

### D.  *Owens* is Inapposite Because Owens Was Not a Member of the Crew and Therefore None of His Work Could Have Been Seaman's Work

As noted above (at 4, 10-12), to establish that a maritime worker is an exempt seaman under FLSA, an employer must demonstrate first that the worker is either a master or subject to the authority, direction, and control of the master aboard a vessel (*i.e.*, that he is a vessel-based worker or member of a crew); *and then* that he performs "service which is rendered primarily as an aid in the operation of such vessel as a means of transportation."   29 C.F.R. § 783.31.   Because he was not a member of a vessel's crew, the worker in *Owens v. SeaRiver Maritime,*

*Inc.*, 272 F.3d 698 (5th Cir. 2001), was not engaged in seaman's work regardless of the nature of that work.

In *Owens*, a panel of this Court held that a land-based member of a Strike Team whose *sole* vessel responsibilities were loading and discharging cargo was not an FLSA-exempt seaman. *Id.* at 700. That holding is best understood as reflecting a straightforward application of the longstanding distinction between land-based workers, who are not seamen, and vessel-based workers, who may be seamen. As the *Owens* Court emphasized, "[a]s a member of the Strike Team, Owens was not a member of a towboat crew and was not tied to any vessel for the duration of a voyage." *Id.* Moreover, "the Strike Team worked on unattended or 'tramp' barges that were neither towed by SeaRiver boats nor attended by SeaRiver crews." *Id.* Thus, regardless of the character of the work he performed, Owens was not a seaman. He was not a Jones Act seaman because he did not have a substantial employment-related connection to a vessel or fleet of vessels. *See*, *e.g.*, *Chandris*, 515 U.S. at 368-70; *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 560 (1997) (recognizing the "fleet" doctrine). Similarly, Owens was not an FLSA-exempt seaman because he was neither a "master" nor "subject to the authority, direction, and control of the master aboard a vessel." 29 C.F.R. § 783.31. Importantly, the *Owens* panel recognized that its inquiry was limited to shore-based workers, by noting that "Owens does not dispute his status as a seaman when he

was a towboat [apprentice tankerman, tankerman, and senior tankerman]." 272 F.3d at 701.

Although Owens's status as a shore-based worker was determinative of his nonseaman status, the *Owens* panel went beyond the shore-based/land-based inquiry to consider the character of Owens's work as part of its assessment of the seaman's exemption, concluding that Owens's loading and unloading duties did not constitute seaman's work because they only "*prepare[d]* the vessel for navigation," they did "not aid in its actual *operation* as a means of transportation." *Id.* at 704. The court below erroneously concluded that this discussion of the purpose of Owens's loading and unloading work was dispositive of appellees' claims in this case. App. at Tab II p. 12. ("*Owens* dictates the conclusion that Plaintiff's Loading and Unloading Duties were not an 'aid in the operation of [the] vessel as a means of transportation.' Therefore these duties were not seaman's work under FLSA.") (citations omitted).

The district court's conclusion that loading and unloading a vessel is not seaman's work even when performed by a member of the crew is erroneous, and finds no support in the case law or the DOL's interpretations. As noted above (at 12-14), courts have held that all manner of work, even that not directly tied to navigation or transportation, constitutes seaman's work when performed by a member of the crew. The Supreme Court has consistently recognized loading and unloading

as seaman's work.  *See supra* at 14-16.  The principal DOL interpretations are consistent with this widespread understanding.  They provide that "[t]he term 'seaman' includes members of the crew such as . . . pursers, surgeons, cooks, and stewards."  29 C.F.R. § 783.32.[7]  None of the listed crew members provide services that directly aid in transportation or navigation.  Moreover, if those services were provided by land-based employees, the employees would likely not qualify as seamen.  Nonetheless, when performed by members of the crew, they contribute to the mission of the vessel and qualify as seaman's work.  Loading and unloading cargo remains "seaman's work."  *Sieracki*, 328 U.S. at 99.

Of course, not all work performed by Jones Act seamen is necessarily seaman's work.  Under the *Chandris* 30% test, *see supra* at 9, a worker spending the majority of his time doing nonseaman's work can still qualify as a Jones Act sea-

---

[7]  In 29 C.F.R. § 783.36, the DOL states that "loading and unloading [duties] . . . do not constitute service performed primarily as an aid in the operation of these vessels as a means of transportation" and consequently workers primarily or substantially engaged in performing those duties are not seamen.  The DOL cites three cases to support that proposition: *McCarthy v. Wright & Cobb Lighterage Co.*, 163 F.2d 92 (2d Cir. 1947), *Anderson v. Manhattan Lighterage Corp.*, 148 F.2d 971 (2d Cir. 1945), and *Tobin v. Woods Lumber Co.*, 20 Lab. Cas. (CCH) ¶ 66,640 (W.D. Tenn. 1951), *aff'd*, 199 F.2d 455 (6th Cir. 1952) (per curiam).  If the DOL intended this interpretation to extend to vessel-based crew members, the cases cannot support it.  The *Anderson* and *McCarthy* workers were land-based, and that status was determinative.  *See*, *e.g.*, *Anderson*, 148 F.2d at 972 ("[P]laintiffs' strictly nautical duties are few.  Defendant's lighters . . . are towed by tugboats.  The tug crew generally takes charge of navigation.  Plaintiffs usually are not even on board during the tow, for towing is done mostly at night after they have gone home."); *McCarthy*, 163 F.2d at 93 ("According to [plaintiff's] testimony, [his navigational] duties only occupied a few minutes a day. . . .  [H]e lived at home on shore and was rarely on the lighter at night. . . .  [W]hen the boat was being towed he had nothing to do except take orders from the tug.").  These cases clearly illustrate and confirm the importance of the distinction between vessel-based and land-based maritime workers, and the corollary that some work will be seaman's work when performed by vessel-based workers and nonseaman's work when performed by land-based workers.  *Tobin* is simply inapposite.

man.  Thus, this Court has held that dredgemen were not FLSA exempt seamen when their "dominant employment" was "the mining and handling of shells as an industrial operation" and their "maritime work [was] incidental and occasional, taking but a small fraction of the work time."  *Walling v. W.D. Haden Co.*, 153 F.2d 196, 199 (5th Cir. 1946).  Similarly, the *Dole* Court held that seamen "principally employed . . . to service and maintain [oil] wells" were not exempt.  876 F.2d at 521.  Unlike loading and unloading, mining shells and servicing oil wells have no connection with the operation of the vessel as a means of transportation.  In each case, the seamen spent over 50% of their time on duties unconnected to the vessels.

Unlike *Walling*'s industrial dredgemen and *Dole*'s oil-well maintenance workers, tankermen are traditional vessel-based mariners doing all manner of seaman's work in addition to their loading and unloading duties.  And unlike Owens, a land-based worker whose primary responsibilities involved loading and unloading cargo, appellees are vessel-based workers with primary responsibilities in line with the other seamen on the vessel.  As this Court said in an analogous context, to read prior cases as denying the seaman's exemption to a vessel-based tankerman "would be to refuse to extend the exemption to 'one plainly and unmistakably within its terms and spirit.'"  *Louviere*, 239 F.2d at 165.

## II. Treating Vessel-based Tankermen as Non-exempt Seamen Would Not Serve the Underlying Goals of the FLSA's Overtime Provision, Would Undermine Settled Expectations, and Would Disrupt Commerce in Inland and Coastal Waterways

The importance of the land-based/vessel-based distinction for purposes of the seaman's exemption is underscored by the history and purposes of the FLSA's overtime provision and the seamen's exemption thereto, as well as the long and settled practices of the industry.

When Congress originally enacted the FLSA in 1938, it exempted seamen from coverage under the Act's minimum-wage and overtime provisions at the urging of the seamen's unions. *See Walling v. Bay State Dredging & Contracting Co.*, 149 F.2d 346, 349-50 (1st Cir. 1945). In 1961, Congress extended the FLSA minimum-wage provisions to all seamen on U.S. vessels. *Tate v. Showboat Marina Casino Partnership*, 431 F.3d 580, 584 (7th Cir. 2005). Again at the urging of seaman's unions, however, Congress retained the seaman's overtime exemption. *Pacific Merchant Shipping*, 918 F.2d at 1418 n.13.

The continuing exemption "recognizes that at sea, with a normal life impossible, working more than 40 hours a week is an appropriate work norm," *Harkins*, 385 F.3d at 1102, and thus applying the overtime provision to vessel-based workers would be unduly burdensome and would not further the underlying goals of the provision. That commonsense observation remains true.

The pervasive reality of commerce on inland and coastal waterways renders a 40-hour workweek impossible for vessel-based crews. Crews live and work together for weeks at a time in tight quarters, alternating on-duty and off-duty according to their twice-a-day "watches." Moreover, the actual day-to-day and week-to-week tasks performed by any particular crewman during his watch fluctuate dramatically. The crew is responsible for every aspect of shipboard life and they attend to those duties as necessary, not according to a rigid, predictable schedule. The particular tasks performed in a given day or week by each crewman – including the tankerman – vary depending on weather, cargo schedules, mechanical issues, water traffic, crew illness or injury, and a myriad other unpredictable factors. As noted above (at 6), in some weeks, a tankerman might spend 30% of his time loading and unloading cargo, in other weeks virtually none.

In light of the realities of maritime commerce, applying the FLSA overtime provisions to typical crewmen doing typical maritime work would ill serve FLSA's underlying goals. Those provisions advance three goals:

> The legislative history of the overtime provisions suggests that the requirement of paying time and a half for overtime work had a threefold purpose. See H.R. Rep. No. 1452, 75th Cong., 1st Sess. (1937); S. Rep. No. 884, 75th Cong., 1st Sess. (1937) . . . . The first purpose was to prevent workers willing (maybe out of desperation . . .) to work abnormally long hours from taking jobs away from workers who prefer to work shorter hours. . . . The second purpose was to spread work and thereby reduce unemployment, by requiring an employer to pay a penalty for using fewer workers to do the same amount of work as would be necessary if each worker

worked a shorter week.  The third purpose was to protect the over-time workers from themselves: long hours of work might impair their health or lead to more accidents (which might endanger other workers as well).

*Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1175-76 (7th Cir. 1987).

As noted above (at 22), given the constraints of maritime commerce and employment, those goals cannot be served by applying the overtime provision to vessel-based tankermen.  Given crew requirements and vessel configuration, maritime employers cannot hire additional crewmen to "spread work," because there would be no place for them to live on board.  Even if employers could add a third crew, that would require more people to spend their nonworking time  – 16 hours per day, 20-28 days a month – in tiny quarters on a working vessel in an inland or coastal waterway.

The Supreme Court recently resolved a claim for overtime compensation by employees in another job that had also long been considered exempt throughout the industry.  In *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012), pharmaceutical sales representatives, known as "detailers," sought over-time pay notwithstanding the FLSA exemption for outside salesmen.  *See* 29 U.S.C. § 213(a)(1).  As with "seaman," the FLSA does not define the term "outside salesman."  132 S. Ct. at 2162.  DOL regulations, however, provided some guid-ance.  Under the applicable regulation, "an outside salesman is any employee

whose primary duty is making any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." *Id*.

Although federal law prohibits detailers from making actual sales (they provide information and samples to physicians, who prescribe drugs that are then sold at a pharmacy), the Supreme Court nonetheless concluded that detailers are exempt for several reasons. First, the Court noted the detailers "bear all external indicia of salesmen." *Id*. at 2172. Next, the Court held that that applying the outside sales exemption to detailers "comports with the apparent purpose of the FLSA's exemption for outside salesman." *Id*. at 2173. The detailers, "each of whom earned an average of more than $70,000 per year and spent between 10 and 20 hours outside normal business hours each week performing work related to his assigned portfolio of drugs . . . are hardly the kind of employees that the FLSA was intended to protect." *Id*. Finally, the Court pointed out that "it would be challenging, to say the least, for pharmaceutical companies to compensate detailers for overtime going forward without significantly changing the nature of that position." *Id*.

Similarly, tankermen are "hardly the kind of employees that the FLSA was intended to protect." They have all the indicia of typical seamen, and their salaries are commensurable with those of the detailers in *Christopher*. Moreover, it would be "challenging, to say the least, for [the shipping industry] to compensate [tankermen] for overtime." Applying the FLSA overtime provisions to vessel-

based tankermen would require maritime employers to keep very detailed records of the daily tasks performed by all tankermen employed on their vessels to estimate whether they engaged in loading and unloading activities for more than 20% of their workweek.  If they did, they would be nonexempt workers entitled to over-time compensation.  If they did not, they would be exempt seamen who could be paid the prevailing day rate, as is every other crew member.  Given the fluid, var-ied, and unpredictable flow of work on a vessel, keeping incontrovertible records of a tankerman's duties would be nearly impossible.  The challenge is illustrated by the dispute in this case over whether these tankermen engaged in loading and unloading duties more or less than 20% of their workweek.  Given the impossi-bility of keeping definitive records, a ruling that loading and unloading is not sea-man's work would generate significant litigation in which federal courts attempt to determine whether a particular employee spent 19% of his time loading and un-loading a barge or 21% of his time doing that sort of work.

More importantly, if a vessel-based tankerman's loading and unloading duties are not seaman's work, then every tankerman in the inland and coastal fleet will move in and out of seaman's status depending on factors that neither he nor his employer can control.  That is the precise situation this Court cautioned against in *Owens*:

> In a given week, [a] crew member may, *without* any change in
> basic assignment or position, spend more than 20 percent of his

> time performing nonseaman's work.  This should not mean that the crew member loses his seaman status for that week, and in such a case the crew member should remain a seaman unless, as a *general* matter, a substantial portion of his time was taken up by nonseaman's work.  To hold otherwise would produce an absurd result – crew members on vessels who spent the vast majority of their time at sea would, *without* any change in their basic assignment or position, lose their seaman status for the few weeks a year their vessels were in port.

*Owens*, 272 F.3d at 702 n.5.[8]

Moreover, the district court's interpretation of the seaman's exemption would have the perverse consequence of inverting the FLSA inquiry in a manner that threatens to expand, not restrict, the scope of the exemption.  If shore-based maritime workers could be classified as FLSA-exempt seamen based on the character of the work they perform – an implicit premise of the district court's opinion – the exemption potentially could expand dramatically, encompassing many workers who would not even qualify as Jones Act seaman because they were not connected to a vessel or fleet.  For example, as this Court held in *Martin*, a vessel-based cook engages in seaman's work when he cooks for members of the crew.  Under the district court's reasoning a land-based worker who cooks for a vessel's crew would also be engaged in seaman's work.  Thus, if the shipowner hired a

---

[8]  The Supreme Court has also warned against this evil in analogous contexts.  *E.g.*, *Chandris*, 515 U.S. at 363 (rejecting a "snapshot" approach to Jones Act coverage so that a worker will "not oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged"); *P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 83 n.18 (1979) (noting Congress's "concern[] that some workers might walk in and walk out of [LHWCA] coverage"); *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 274 (1977) (noting Congress's intention to eliminate "shifting and fortuitous coverage" under the LHWCA).

caterer to deliver ready-to-eat meals for the crew to eat during a voyage, that caterer would be engaged in seaman's work. And if that work constituted more than 80% of the workweek, the cook would be an exempt seaman. Similarly, cleaning the vessel is seaman's work when performed by a deckhand. *See Selby*, 624 F.Supp.2d at 1378. Under the reasoning of the decision below, a janitor who works full time for a shipping company in an 8-5 job cleaning vessels while they are in port would be an exempt seaman. Many other traditional seaman's duties currently done by vessel-based crew may in the future be done by land-based workers. If that occurs, the land-based workers should not be considered seamen. Under the district court's reasoning, they would.

By contrast, if the FLSA exemption is applied as the DOL indicates – first determining if a worker is vessel-based and then determining whether the character of the vessel-based worker's duties are primarily related to the operation of the vessel for transportation – the exemption will, necessarily, apply to only a subset of Jones Act seaman.[9] This analysis is consistent with the text, purpose, and history of the FLSA, as well as with this Court's prior interpretations of the statute. And under this analysis, vessel-based tankermen are indisputably seamen exempt from the FLSA's overtime provisions. Holding otherwise would unduly disrupt an

---

[9] The two-step inquiry, required by the DOL interpretive bulletin, would also alleviate a concern expressed by the *Owens* panel that a broader view of "seaman's work" that includes tasks that "prepare" a vessel for navigation would encompass land-based workers such as those who install navigation equipment on vessels or work at refueling docks. *See* 272 F.3d at 704 n.6. That could not happen if land-based workers are categorically not seaman.

established and efficient component of the nation's interstate commerce system without advancing the FLSA's goals.

## **CONCLUSION**

The judgment of the district court should be reversed.

Respectfully submitted,

Lynn E. Blais (TX Bar No. 02422520)
Michael F. Sturley (NY Bar No. 1939537)
727 East Dean Keeton Street
Austin, Texas  78705
Telephone:  (512) 232-1334
Facsimile:  (512) 471-6988
**ATTORNEYS FOR AMICUS
THE AMERICAN WATERWAYS
OPERATORS**

## **CERTIFICATE OF COMPLIANCE**

1.   This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,997 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(6) and Fifth Circuit Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font for text and 12-point Times New Roman font for footnotes.

/s/ Lynn E. Blais
Lynn E. Blais

**Counsel for Amicus**
**The American Waterways Operators**

July 5, 2013